## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**TRACY MCCONNELL,**

     **Plaintiff,**

     **v.**                           **Case No. 21-1041-JAR-KGG**

**IMA FINANCIAL GROUP, INC.,**

     **Defendant.**

## MEMORANDUM AND ORDER

This matter is before the Court on Plaintiff Tracy McConnell's Motion for Temporary Restraining Order (Doc. 2). McConnell filed the motion for temporary restraining order along with his Verified Complaint on February 12, 2021. McConnell seeks a temporary order enjoining and restraining his former employer, Defendant IMA Financial Group, Inc. ("IMA"), from enforcing the restrictive covenants contained in McConnell's Confidentiality, Nondisclosure, and Non-Solicitation Agreement with IMA. IMA filed an expedited response on February 19, 2021. On February 26, 2021, McConnell replied and filed an Amended Verified Complaint. The Court conducted a telephonic hearing on the motion on March 3, 2021, during which the Court heard arguments from both parties and then took the matter under advisement. As explained more fully below, the Court denies McConnell's motion.

**I.    Background**

The following facts are alleged in the Amended Verified Complaint or are contained in the exhibits attached to IMA's response. McConnell has worked as an insurance professional specializing in employee benefits since 1991. In September 2008, McConnell began working for IMA, an insurance brokerage firm, as an insurance provider in its Overland Park, Kansas office. IMA describes itself as a "diversified financial services company focused on protecting the

assets of its widely varied client base through insurance and wealth management solutions."[1]

While IMA is headquartered in Wichita, Kansas, it is largely operated from its Denver, Colorado

location.

### The Agreement

On September 22, 2008, IMA and McConnell entered into a Confidentiality,

Nondisclosure, and Non-Solicitation Agreement ("Agreement").  The Agreement provides that

McConnell's employment is at-will, and he may be terminated without cause with thirty days'

notice.  The Agreement prohibits the disclosure of IMA's confidential information and trade

secrets, which includes IMA's client and prospective client information.

Paragraph 9 of the Agreement, entitled "Solicitation of Clients, Customers, Prospective

Clients Or Customers, and Employees," contains restrictive covenants pertaining to non-

solicitation and anti-raiding.[2]  Paragraph 9(a), the non-solicitation clause, provides:

> EMPLOYEE recognizes and acknowledges EMPLOYER's
> legitimate interest in protecting EMPLOYER's Clients, Customers,
> and Prospective Clients or Customers.  In the event of termination
> of employment of EMPLOYEE, whether voluntary or involuntary,
> and whether for Termination With Cause or Termination Without
> Cause, and for a period of two (2) years after the termination of
> employment, EMPLOYEE will not directly or indirectly, on his or
> her own behalf or on behalf of others, contact, solicit, divert, make
> sales to, do Business with, perform services with regards to, place
> insurance for, or attempt to procure Business from any Client,
> Customer, or Prospective Client Or Customer of EMPLOYER who
> was: (i) a Client or Customer of EMPLOYER during the two year
> period immediately preceding EMPLOYEE'S cessation of
> employment with EMPLOYER and with whom EMPLOYEE had
> direct or indirect Business contact with while EMPLOYEE was
> employed by EMPLOYER; or (ii) a Prospective Client Or
> Customer who was a Prospective Client Or Customer during the
> two year period immediately preceding EMPLOYEE'S cessation
> of employment with EMPLOYER, provided EMPLOYEE

---

[1] Doc. 10 ¶ 9.

[2] Doc. 8-1 ¶ 9.

> participated in or provided input into such sales presentation or
> sales effort while employed by EMPLOYER.[3]

"[N]o geographic restriction . . . applies" to the non-solicitation clause because IMA's clients

and prospective clients "are not confined to any geographic area."[4]

Paragraph 9(b), the anti-raiding clause, provides:

> EMPLOYEE also agrees that, for a period of two (2) years
> following the date of EMPLOYEE'S termination of employment,
> whether voluntary or involuntary, and whether for Termination
> With Cause or Termination Without Cause, EMPLOYEE shall not,
> directly or indirectly, solicit or induce any employees of
> EMPLOYER who were employed by EMPLOYER at the time of
> termination of EMPLOYEE'S employment with EMPLOYER, or
> who were employed by EMPLOYER within six (6) months after
> the termination of EMPLOYEE'S employment with EMPLOYER,
> to leave the employment of EMPLOYER or to enter into any
> Business competitive with EMPLOYER, nor shall EMPLOYEE,
> directly or indirectly, hire any such employees or engage in
> Business with any such employees, as partners, owners,
> shareholders, or co-employees of a Business competitive with
> EMPLOYER.[5]

Under the Agreement, McConnell is "free to compete with the type of Business

conducted by [IMA]" so long as he does not, among other things, breach the restrictive

covenants.[6]  If McConnell breaches the Agreement, IMA may seek "all legal and equitable

remedies and damages available."[7]  And if IMA "loses any revenue as a result of [McConnell's]

breach of paragraph 9," McConnell must pay IMA liquidated damages in an amount equal to two

---

[3] *Id.* ¶ 9(a).

[4] *Id.* ¶ 9(c).

[5] *Id.* ¶ 9(b).

[6] *Id.* ¶ 10.

[7] *Id.* ¶ 11(a).

times the total revenue generated by the client for the "immediately preceding policy or contract period, or twelve months, whichever is greater."[8]

### IMA's Medical Stop-Loss Program

In 2017, IMA began using a partnership panel to place medical stop-loss insurance policies.  IMA's partnership panel consists of eight of the country's seventeen direct writers of stop-loss coverage.  Kristi Gjellum, an executive vice president of IMA and co-lead of its employee benefits group, explains in her declaration that "the primary purpose of the panel is to enable IMA to leverage its block of business and relationships with top executives to provide IMA clients with consistent contract and coverage language and comfort when there were grey issues for claims or other coverage issues."[9]  IMA receives contingent commissions by using its panel partners to sell stop-loss coverage.  These contingent commissions are usually higher than the commission rates IMA would receive by using non-panel providers.  Many large insurance brokers in the industry use partnership panels.

McConnell alleges IMA mandated that employees only offer medical stop-loss insurance through panel partners, meaning employees had to work exclusively through the panel without exploring the wider market for more competitive options.  He alleges that "[m]andating the use of panel partners can result in brokers steering their clients to policies that do not always provide the clients with the best possible terms and pricing."[10]  According to IMA, it did not mandate that employees exclusively use the panel; as McConnell recognized in a July 2019 email to his

---

[8] *Id.* ¶ 11(b).

[9] Doc. 8-2 ¶ 3.

[10] Doc. 10 ¶ 28.

team, employees could use non-panel carriers if IMA could not "get a good solution through the panel."[11]

McConnell alleges that IMA management directed its account executives and analysts to tell clients that it used the partnership panel because the panel provided better contract language and could assure better claims payments, despite the availability of the same language and terms in the wider market.  He also alleges that IMA only disclosed to its clients that the panel partners paid IMA higher commission rates if a client requested a compensation disclosure.

Around the same time, James Clement—a friend and executive at Stealth Partner Group ("Stealth"), a specialty medical stop-loss firm—asked McConnell to meet with him on several occasions to discuss Stealth.  Each time, McConnell told Clement that a meeting would not be productive because he could not promote or sell programs offered by Stealth.  McConnell explained to Clement that IMA had decided to work only with its panel partners.  After learning more about the services Stealth offered, however, McConnell introduced Clement to Gjellum and John Kirke, president of IMA's Benefits & Total Rewards, because he felt that a partnership could be beneficial to IMA and its clients.

In early 2018, Kirke and Gjellum traveled to Phoenix, Arizona to meet with Stealth's leadership team.  McConnell alleges someone at IMA told him that Kirke liked the services Stealth offered but Gjellum did not, and that Gjellum's biggest concern was that IMA would lose contingency revenue if IMA worked with Stealth rather than its panel partners.  Gjellum states in her declaration that "[w]hile contingency revenue is a consideration, it is not the main driver."[12]

---

[11] Doc. 8-5.

[12] Doc. 8-2 ¶ 6.

From Gjellum's perspective, McConnell wanted to use Stealth without first going through IMA's panel partners because he believed Stealth would give him the lowest bid.  But Gjellum and Winkler disagreed with McConnell's assessment of Stealth and the value it provided relative to IMA's panel partners.  They did not think McConnell's assessment accurately captured the value of the trust and negotiation power that IMA had with its panel partners if issues with the policy later arose.  They also thought McConnell's view disregarded that brokers generally do not advise clients to switch stop-loss carriers when they experience only reasonable increases.  This is because there is inherent risk whenever a switch occurs—such as missed disclosures, new terms, and new processing standards—which may increase a client's financial exposure.  Thus, before advising a client to switch stop-loss carriers, Gjellum explains, the increase in rate must be sufficiently large to account for the potential risk associated with changing contracts.

### *2018 Fall Renewal Cycle*

During the 2018 fall renewal cycle, IMA clients were sent to IMA's stop-loss panel partners for proposals.  McConnell alleges that, in many cases, the panel partners declined to provide proposals, and those that did provided proposals with large premium increases and, often, reduced terms.  McConnell requested permission from IMA management to explore the options that Stealth and the rest of the market could provide.  IMA management denied his request and instructed him to only sell what the panel partners offered and to not explore other market possibilities.

In 2018, one of McConnell's clients was coming off a bad claims year and faced a significant rate increase to its stop-loss policy renewing October 2018.  McConnell directed the account executive to send the information to Stealth to see if it could provide a better offer.

Stealth offered multiple options that were less expensive than the panel offers. Before presenting the Stealth offers to the client, McConnell and the account executive asked Gjellum and Donald Lee, a vice president of IMA, for approval. McConnell alleges that Gjellum and Lee expressed anger at McConnell for making inquiries outside of the panel, and that he tried to explain that it was both his and IMA's duty to the client to find the best options available and present all proposals. Although Gjellum and Lee initially insisted that McConnell only present the panel offers, they allowed the Stealth offers to be presented after McConnell and the account executive said Gjellum and Lee would have to present the panel offers themselves. The client ultimately chose a Stealth offer and paid approximately $150,000 less than it would have paid under a panel offer.

Gjellum states that $150,000 represents a mere fraction of what the client paid in yearly premiums, and without a comparison between the panel proposal and the Stealth offer, it is difficult to determine whether the client should have switched carriers. Gjellum also notes that she and Lee were upset not because McConnell used Stealth, but rather because McConnell disregarded the established process under its stop-loss program.

McConnell subsequently asked IMA management if he could seek proposals from Stealth or others in the market for other clients who received panel proposals that he contends were not competitive. In most cases, IMA denied the requests and instructed account executives to deliver the panel proposals even though they had not explored the wider market for more competitive options. McConnell alleges "[a]ccount executives were told they should not know that Stealth or others would provide better options than the panel partners because they were not permitted to

market to them."[13]  Nevertheless, during the fall 2018 renewal cycle, three Kansas City IMA clients ultimately worked with Stealth.

### 2019 Fall Renewal Cycle

Throughout 2019, McConnell continued to communicate with Gjellum about a partnership with Stealth.  Gjellum accused McConnell of only advocating for such a partnership because Clement was his friend.  McConnell then suggested a partnership with AmWins, which he believed could offer similar benefits and savings for clients.  McConnell again told Gjellum that ignoring the wider market to obtain stop-loss insurance through IMA's panel partners was not in the best interests of its clients.

During the 2019 fall renewal cycle, IMA sought to ensure the clients that obtained stop-loss insurance through Stealth in 2018 would purchase insurance from IMA's panel partners in the future.  According to McConnell, IMA's motive was to earn more in contingencies through its panel partners.  IMA informed Stealth that, in three years, IMA would resume control over the marketing for these clients.  McConnell again expressed frustration about IMA's stop-loss program, and asserted that having partners like Stealth, in addition to panel partners, gave clients more options in the market and kept the panel partners competitive.  IMA management told McConnell to accept the stop-loss program and to stop raising concerns.

Throughout 2019 and into early 2020, McConnell continued to raise concerns about IMA's partnership panel, and whether working exclusively through the panel was in the best interests of IMA's clients.  Over several discussions, McConnell tried to explain to Gjellum and Laurie Hoag Winkler, also an executive vice president of IMA and co-lead of its employee benefits group, that Kansas City was experiencing a tough stop-loss market and that its clients

---

[13] Doc. 10 ¶ 57.

needed more options than panel partners could provide.  McConnell told them that surveying the broader market would incentivize the panel partners to provide the best terms possible and ensure that IMA did its best for clients.  Gjellum and Winkler again showed no interest in McConnell's suggestions.

In July 2020, McConnell asked to meet with Gjellum, Winkler, and Julia Kalenski, IMA's head of stop-loss insurance, to discuss IMA's stop-loss program.  McConnell made the following points at the meeting: (1) "[b]y ignoring other options in the market, IMA was failing to do what its clients hired it to do—represent their best interests and shop the market to find the best solutions"; (2) "[s]top-loss insurance is a difficult coverage line and IMA had put a relatively inexperienced analyst (Kalenski) in charge.  Kalenski was responsible for managing approximately $50 million of stop-loss business among many clients without adequate support staff. . . .  Kalenski was doing a good job, but she was in a difficult position"; (3) "IMA could keep its panel partners and market directly to them, but it could also have Stealth investigate other options to make sure IMA had served its obligation to its clients to find the best terms possible while completing the entire stop-loss marketing process much faster"; and (4) "IMA's panel partners were reputable carriers, but . . . the proposals for clients operating in the Kansas City area had been disappointing."[14]  McConnell acknowledged that it was IMA's management's decision to make, and stated that he would adhere to their decision.  During the meeting, Gjellum became angry and frustrated with McConnell and left.  The meeting did not lead to any change in IMA's stop-loss program.

McConnell alleges that he subsequently reported his concerns about IMA's stop-loss program to Jeff Stemper, IMA's National Sales & Marketing Leader, who was responsible for

---

[14] Doc. 10 ¶¶ 76–77.

ensuring IMA's producers complied with the legal and ethical obligations they owed to clients. McConnell also alleges that he had multiple conversations with Patrick Lanning, President of IMA-Kansas City, reporting his concerns about IMA's stop-loss program. Both Stemper and Lanning report directly to Bob Reiter, President of IMA.

### 2020 Fall Renewal Cycle

In September 2020, McConnell, Peter Hein, a technical analyst at IMA, and Alli Boyd, an IMA account executive, held a teleconference with a client to discuss an upcoming renewal. During the meeting, the client had questions about the stop-loss process because the company had a difficult renewal year in 2019. Hein told the client that IMA was soliciting proposals from its panel partners and that he was working with them to try find better options. After the client asked about the next steps if the panel proposals were disappointing, Hein explained that IMA would then seek approval to obtain proposals from additional markets to see if it could find better terms. The client then asked whether IMA could seek proposals from all markets at the outset to save time. Hein did not directly answer; rather, he responded that IMA would try to get all the information from the panel the client needed as fast as possible. The client then instructed Hein to seek proposals from the full market without delay.

Hein and Boyd later suggested to others at IMA that McConnell must have encouraged the client to make that request. McConnell told IMA management that he did not encourage the client to seek proposals from outside of IMA's panel or to challenge IMA's process as outlined by Hein during the meeting.

### McConnell's Performance

During his tenure at IMA, McConnell was a top producer. He was named Producer of the Year in 2013. He was also named to IMA's Circle of Excellence in 2014 and 2015, in

recognition of his status as one of IMA's top three revenue producers. With IMA's assistance, McConnell eventually built a book of business worth approximately $2.6 million.

Beginning in 2018, McConnell's new production numbers declined and his reliance on existing clients increased. For instance, in 2018, McConnell produced $17,000 in new revenue. In 2019, McConnell had a better year, but, in the ten months leading up to his notice of termination in October 2020, McConnell had generated no new revenue. In total, between 2018 and 2020, McConnell sold approximately $155,000 worth of new business. During that same period, McConnell received approximately $1.9 million in compensation from IMA.

In addition to his lack of recent production, McConnell in 2018 began having issues with his colleagues and some IMA clients. In mid-2018, for instance, a large IMA client requested that McConnell no longer be associated with its account and that he receive no commission or credit for the premiums it paid because it concluded that McConnell had acted dishonestly in some of his work on the account. At the end of 2019, IMA notified McConnell that he would no longer be looked upon to serve as the de facto Market Leader for the Kansas City office, and he would also need to forfeit the associated stipend.

In the following months, Stemper received complaints from Gjellum and Winkler, as well as others, that "McConnell was attempting to sneak around the rules that the employee benefits group had set for obtaining coverage, was abusing the joint venture process to increase his commission, and was undermining his colleagues and doing so even in front of clients."[15]

On July 17, 2020, Stemper spoke with McConnell about these issues. Shortly after the conversation, Stemper sent McConnell a follow-up email summarizing the phone call, in which he reiterated the following points: (1) "[t]hank you for acknowledging you will not be acting as

---

[15] Doc. 8-3 ¶ 5; Doc. 8-4 ¶ 4.

the KC Market Leader"; (2) "KC benefits opportunities do not need to go through you.  I hear your frustration that you believe you never conveyed that message.  I do appreciate your willingness to help as needed"; (3) "let's play nice and 'stay in the rails' and work with our teams.  If you need help on being creative outside our norm – ask for it"; and (4) "KEEP Selling. I need you to produce and love what I hear is in your pipeline.  Keep your head down and get some wins."[16]  Stemper concluded the email by warning, "Tracy, I have to say we don't want to have this conversation again about market leader, etc.  There is attention on this you do not want. Help me [] help you[.]  I am here . . . to help and support you. . . .  This is a tough conversation. Thank you for listening and acknowledging."[17]

McConnell replied to the email and stated the following in response Stemper's reminder that he needed to "play nice and 'stay in the rails'":

> I don't, for a minute, believe that Kristi [Gjellum] or Laurie
> [Hoag Winkler] are not doing everything they can to do what's
> right for IMA, our clients and our associates.  I told you we have
> been hit hard in KC for Stop Loss renewals in the past couple of
> years.  In an effort to find solutions for our clients, we were able
> to utilize a third party called Stealth, to help find us markets that
> would write stop loss for our clients and with reasonable rates and
> terms.  I have simply brought up my thoughts regarding why I
> don't necessarily believe a limited panel of markets is the best way
> to manage stop loss for our clients, especially in a hard market.  I
> am just asking and trying to make sure we are doing what is the
> best for our clients. . . .
>
> I was not rude about any of the discussion, I simply tried to
> make points as to the value of a partner like Stealth.  In the end of
> the conversation I simply conceded that I am fine with the Panel
> and hope we get good offers from our Panel for our clients.  I told
> them specifically I was not trying to step on toes and think Julia
> [Kalenski] does a great job with Stop Loss.  She is just one person
> trying to manage a very difficult part of our business and

---

[16] Doc. 8-6.

[17] Id.

> companies like Stealth have deep benches with both Underwriting
> and claims experts that work on behalf of their broker partners.
>
> Yes, I do have a buddy at Stealth but I told him that we
> were not interested for over a year and then we got caught in a
> corner with regard to the markets and he bailed us out so I felt
> there was value in the possibility of them being an IMA partner
> and resource. We have a verbal agreement to utilize Stealth but
> only after our markets cannot provide a solution. I did say to Kristi
> [Gjellum] that it may be good to set up a formal agreement so that
> all parties knew the rules of engagement.[18]

In September 2020, Winkler spoke to an account executive and technical consultant about interactions they recently had with McConnell while working on an account. The account executive and technical consultant reported feeling that McConnell was "undermining" them, that they could "no[t] trust" McConnell, and that McConnell had been "very condescending toward" the client's representative.[19] The account executive and technical consultant requested to be permanently removed from the account, and Winkler granted the request.

Winkler held a series of calls with McConnell at the end of September 2020. During what was intended to be the last call, Winkler discussed with McConnell the specific concerns that the account executive and technical consultant raised. During the call, McConnell became more and more distraught and stated at least once his belief that he was going to be fired. Winkler decided to end the call and to follow up with him the next week, which she did.

### McConnell's Termination

On October 19, 2020, McConnell joined what he had been told was a virtual "planning meeting" with Stemper. At the outset of the meeting, Stemper informed McConnell that IMA was terminating his employment without cause. McConnell alleges he was surprised by his

---

[18] *Id.*

[19] Doc. 8-4 ¶ 5.

termination and asked if his lack of production was the cause.  Stemper responded that lack of production was not the reason.  McConnell asked for the reasons for his termination, but Stemper refused to provide any.

Pursuant to the Agreement, the termination became effective thirty days later, on November 19, 2020.  IMA and McConnell engaged in discussions about a severance package, but communications ultimately broke down in December 2020.  In response to McConnell's representation that he believed the Agreement was unenforceable, IMA informed him that it was "prepared to enforce [McConnell's] Nonsolicit Agreement as broadly as possible."[20]

### McConnell's Post-Employment Conduct

Since his termination, McConnell has interacted with IMA employees and clients.  On at least one occasion, McConnell contacted an IMA associate in the Kansas City office to ask for client-specific information after leaving the Kansas City office.  McConnell has also continued to text and call other IMA producers, and he has had personal contact with at least one representative of a large IMA client.  Despite IMA's knowledge of this conduct, it has not threatened legal action against McConnell or otherwise prevented communications that were not clearly related to IMA's business.

In February 2021, McConnell began working for Alliant Insurance Services ("Alliant"), one of the ten largest broker firms in the country, as a senior vice president in its Kansas City office.  In that role, McConnell works with Alliant's Midwest clients to provide employee benefits solutions.

---

[20] Doc. 10 ¶ 105.

On February 12, 2021, McConnell filed this action along with a motion for temporary restraining order asking that the Court restrain IMA from enforcing the restrictive covenants contained in paragraph 9 of the Agreement.

## II.   Legal Standard

A temporary restraining order preserves the status quo and prevents immediate and irreparable harm until the court has an opportunity to pass upon the merits of a demand for preliminary injunction.[21]  The Court applies the same standard governing issuance of preliminary injunctions.[22]  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."[23]  The likelihood-of-success and irreparable-harm factors are "the most critical" in the analysis.[24]

Three types of preliminary injunctions are disfavored in the Tenth Circuit and require the movant to satisfy a heightened standard: (1) preliminary injunctions that alter the status quo; (2) preliminary injunctions that are mandatory rather than prohibitory; and (3) preliminary injunctions that provide the movant all the relief that it could recover after a full trial on the merits.[25]  In seeking a disfavored injunction, the movant must "make[] a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms."[26]

---

[21] *Flying Cross Check, L.L.C. v. Cent. Hockey League, Inc.*, 153 F. Supp. 2d 1253, 1258 (D. Kan. 2001).

[22] *See Rangel-Lopez v. Cox*, 344 F. Supp. 3d 1285, 1289 (D. Kan. 2018) (citing *Sac & Fox Nation of Mo. v. LaFever*, 905 F. Supp. 904, 907 (D. Kan. 1995)).

[23] *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

[24] *Nken v. Holder*, 556 U.S. 418, 434 (2009).

[25] *Fish v. Kobach*, 840 F.3d 710, 723 (10th Cir. 2016) (citations omitted).

[26] *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009) (quoting *O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 976 (10th Cir. 2004) (en banc)).

These requirements apply equally to a temporary restraining order request as to a preliminary injunction request.[27]

## III.    Discussion

McConnell suggests that a modified preliminary injunction standard applies in this case. He asserts that if he satisfies the other three requirements for a preliminary injunction, he may establish likelihood of success "merely by showing questions going to the merits so serious, substantial, difficult and doubtful, as to make the issues fair ground for litigation and deserving of more deliberate investigation."[28]   While the Tenth Circuit previously endorsed this modified standard, the court in 2016 held that "any modified test which relaxes one of the prongs for preliminary relief and thus deviates from the standard test is impermissible."[29]   Thus, the Court may not relax the likelihood-of-success requirement even if the other three factors tip strongly in McConnell's favor.

The Court must also address, as a threshold matter, whether the temporary restraining order McConnell requests is disfavored, and therefore requires him to satisfy a heightened standard.  IMA argues that this case requires application of the heightened standard because the temporary restraining order McConnell seeks would disturb the status quo.

The status quo is "the last uncontested status existing between the parties which preceded the controversy until the outcome of the final hearing."[30]   To determine whether injunctive relief would alter the status quo, the Court looks to "the reality of the existing status and relationships

---

[27] *See Wiechmann v. Ritter*, 44 F. App'x 346, 347 (10th Cir. 2002).

[28] *Fireworks Spectacular, Inc. v. Premier Pyrotechnics, Inc.*, 86 F. Supp. 2d 1102, 1105 (D. Kan. 2000) (quoting *Buca, Inc. v. Gambucci's, Inc.*, 18 F. Supp. 2d 1193, 1201 (D. Kan. 1998)).

[29] *Diné Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276, 1282 (10th Cir. 2016).

[30] *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1155 (10th Cir. 2001).

between the parties, regardless of whether the existing status and relationships may ultimately be found to be in accord or not in accord with the parties' legal rights."[31]

In this case, the last uncontested status between the parties was either before IMA terminated McConnell's employment in October 2020 or before communications about a severance package broke down in December 2020.  Under either scenario, the Agreement was in force at the time, so McConnell's request that the Court restrain IMA from enforcing the restrictive covenants in paragraph 9 of the Agreement would alter the status quo.[32]  Thus, McConnell seeks a disfavored temporary restraining order, and the Court will "more closely scrutinize[]" his case "to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course."[33]

### A.    Likelihood of Success on the Merits

Because McConnell seeks a disfavored temporary restraining order, he must make a "strong showing" on the likelihood-of-success factor.[34]  McConnell argues that he is likely to succeed on the merits because (1) the restrictive covenants in paragraph 9 of the Agreement are unenforceable; and (2) he was wrongfully discharged in retaliation for whistleblowing, and the doctrine of unclean hands thus prohibits enforcement of paragraph 9 of the Agreement.  The Court addresses each claim in turn.

---

[31] *SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1100 (10th Cir. 1991), *overruled on other grounds by O Centro*, 389 F.3d 973.

[32] *Cf. Haggard v. Spine*, No. 09-CV-00721CMAKMT, 2009 WL 1655030, at *14 (D. Colo. June 12, 2009) (finding that an injunction *enforcing* two employment agreements, including the restrictive covenants contained therein, would not alter the status quo because the last uncontested state between the parties was either before the employer terminated the employee or before the employee filed his state court lawsuit; in both situations, the agreements "were in force at the time").

[33] *O Centro*, 389 F.3d at 975.

[34] *Fish v. Kobach*, 840 F.3d 710, 724 (10th Cir. 2016).

### 1.      Enforceability of the Restrictive Covenants

Kansas courts look to the following factors to determine whether a restrictive covenant is reasonable, and therefore enforceable, under the particular facts of each case: "(1) Does the covenant protect a legitimate business interest of the employer? (2) Does the covenant create an undue burden on the employee? (3) Is the covenant injurious to the public welfare? (4) Are the time and territorial limitations contained in the covenant reasonable?"[35]

### a.      Legitimate Business Interests

"[T]he mere desire to prevent ordinary competition does not qualify as a legitimate interest of an employer and a restrictive covenant is unreasonable if the real object is merely to avoid such ordinary competition."[36]  Kansas courts have recognized that "an employer has a legitimate business interest to protect in the following areas: customer contacts, specialized training of employees, trade secrets, confidential business information, loss of clients, goodwill, reputation, referral sources, and preserving contacts with clients."[37]  Protecting customer contacts is particularly important where the employee is "the sole or primary contact with the customers and . . . a close personal relationship with them is fostered, enabling the employee to control such business as a personal asset."[38]

McConnell asserts, without authority or analysis, that IMA merely seeks to stifle ordinary competition and lacks a legitimate business interest in preventing McConnell from (1) competing for prospective IMA clients covered under paragraph 9, (2) working with IMA clients that no

---

[35] *Idbeis v. Wichita Surgical Specialists, P.A.*, 112 P.3d 81, 86–87 (Kan. 2005) (quoting *Weber v. Tillman*, 913 P.2d 84, 90 (Kan. 1996)).

[36] *Weber*, 913 P.2d at 89.

[37] *Wichita Clinic, P.A. v. Louis*, 185 P.3d 946, 952 (Kan. Ct. App. 2008) (citing *Weber*, 913 P.2d at 91).

[38] *E. Distrib. Co. v. Flynn*, 567 P.2d 1371, 1377 (Kan. 1977).

longer desire to do business with IMA and want to work with McConnell, and (3) hiring or working with former IMA employees.[39]

However, the interests identified by IMA are well-recognized under Kansas law as legitimate and entitled to protection.  For over a decade, IMA provided McConnell with confidential information, trade secrets, supporting personnel, and client contacts.  IMA states that it invested in McConnell and provided him the opportunity to develop goodwill and close relationships with clients in his capacity as an insurance professional.  IMA has a legitimate interest in protecting its business relationships and the employees it trained by preventing McConnell from obtaining an unfair advantage and taking them with him after his termination.  Thus, the Court cannot find that the restrictive covenants merely seek to prevent ordinary competition.

### b.    Undue Burden

Typically, Kansas courts consider whether a restrictive covenant imposes an undue burden on a plaintiff by examining the time and territorial limits the covenant imposes on the plaintiff's ability to work for a competitor.[40]  To be reasonable, the time and territorial restrictions "must be no greater than necessary to protect the employer's interest."[41]  With respect to time, "[t]he employer should be given a reasonable period of time to overcome the

---

[39] McConnell also alleges that IMA has no legitimate business interest in preventing him from contacting IMA clients covered under paragraph 9(a) that are also his personal acquaintances.  But IMA does not allege that it does.  IMA notes that the non-solicitation clause does not preclude all types of conversations with covered IMA clients; the restriction is limited to communications intended to solicit or induce.

[40] *See, e.g.*, *Varney Bus. Servs., Inc. v. Pottroff*, 59 P.3d 1003, 1015–17 (Kan. 2002); *Weber*, 913 P.2d at 90–96; *Wichita Clinic*, 185 P.3d at 951–58.

[41] *Weber*, 913 P.2d at 91.

employee's personal hold over the customers."[42]  The Court finds that the two-year time

limitation is reasonable, as Kansas courts readily uphold such time limitations.[43]

The Agreement does not impose a territorial restriction on the non-solicitation clause.

McConnell argues that the absence of a territorial limit renders the non-solicitation clause

unreasonable.  The Court disagrees.  Although the non-solicitation clause lacks a territorial

limitation, it does not seek to prohibit McConnell from soliciting all clients and prospective

clients of IMA.  Paragraph 9(a) of the Agreement covers only (1) clients of IMA "during the two

year period immediately preceding" McConnell's termination "with whom [McConnell] had . . .

Business contact" and (2) prospective IMA clients who McConnell assisted in making a "sales

representation or sales effort[]" in the "two year period immediately preceding" his

termination.[44]  In other words, the non-solicitation clause includes relationship restrictions,

which are themselves narrowed in scope by a two-year look-back period.[45]  Under these

circumstances, the lack of a territorial limitation is reasonable, and thus enforceable.

Further, as evidenced by his recent employment with Alliant, the non-solicitation clause

does not restrict McConnell from working in the insurance industry altogether, or even in

employee benefits, his area of specialty.[46]  Nor does it require McConnell to seek work in

---

[42] *Am. Fid. Assurance Co. v. Leonard*, 81 F. Supp. 2d 1115, 1120 (D. Kan. 2000).

[43] *See Bruce D. Graham, M.D., P.A. v. Cirocco*, 69 P.3d 194, 199 (Kan. Ct. App. 2003) ("We are not bothered by this covenant's 2-year restriction.  Such a time period is common in Kansas noncompetition clause cases."); *see also Uarco, Inc. v. Eastland*, 584 F. Supp. 1259, 1263 (D. Kan. 1984) (upholding two-year restriction); *Weber*, 913 P.2d at 90 (same); *Caring Hearts Pers. Home Servs. v. Hobley*, 130 P.3d 1215, 1222–23 (Kan. Ct. App. 2006) (same); *Wichita Clinic*, 185 P.3d at 958–59 (upholding three-year restriction).

[44] Doc. 8-1 ¶ 9(a).

[45] *Cf. id.* at 1120–21 (finding the territorial limitation of a covenant not to compete "broad[er] than necessary to protect plaintiff's interest in its customers" because the covenant sought to "prohibit defendant from soliciting all customers of plaintiff, regardless of defendant's former contact or relationship with the customers").

[46] *See Weber*, 913 P.2d at 91 (collecting cases and finding no undue burden where the restrictive covenant did not restrict a doctor "from pursuing his chosen profession altogether").

another geographical area.  The Agreement provides that McConnell is "free to compete with the type of Business conducted by [IMA],"[47] even in the Kansas City area, so long as he does not, among other things, violate the restrictive covenants.  Because the non-solicitation clause does not impose greater restrictions than necessary to protect IMA's legitimate business interests, the Court finds that it is reasonable and does not pose an undue burden on McConnell.

### c.  Public Welfare

McConnell argues, without citing any authority, that a restrictive covenant "prohibiting a producer from accepting business from customers who want to continue doing business with that producer, is injurious to the public interest because it denies businesses the freedom to freely work with their preferred insurance professional."[48]  He contends that "the public interest is further served by allowing current or former IMA clients to seek the best policy insurance terms by working with brokers like McConnell instead of being restricted to the panel partners with whom the IMA brokers are required to work."[49]

McConnell has not shown that the desires of any covered IMA clients are thwarted by the non-solicitation agreement because they are unable to work with McConnell.  Even if McConnell did make this showing, "the issue is public welfare, not the private welfare" of an individual client.[50]  McConnell has failed to identify any potential injury to the public welfare caused by the non-solicitation agreement.

---

[47] Doc. 8-1 ¶ 10.

[48] Doc. 3 at 16.

[49] *Id.*

[50] *Caring Hearts Pers. Home Servs., Inc. v. Hobley*, 130 P.3d 1215, 1223 (Kan. Ct. App. 2006).

"The paramount public policy is that freedom to contract is not to be interfered with lightly."[51]  Absent any indication that the restrictive covenants contained in paragraph 9 of the Agreement are unreasonable or contravene the public welfare, the Court cannot find that McConnell has established that he is likely to succeed on the merits of this claim.

### 2.  Retaliatory Discharge for Whistleblowing

"Kansas follows the common-law employment-at-will doctrine, which allows employers to terminate employees for good cause, for no cause, or even for the wrong cause."[52]  To prevail on a retaliatory discharge claim, an employee must demonstrate that they fall within one of the exceptions to the employment-at-will doctrine.[53]  One exception is "termination for whistleblowing."[54]

When a retaliatory discharge claim is based on circumstantial evidence, Kansas courts apply the familiar *McDonnell Douglas Corp. v. Green*[55] burden-shifting framework.[56]  Under *McDonnell Douglas*, the employee must establish a prima facie case of retaliatory discharge.[57]  If the plaintiff establishes a prima facie case, the burden shifts to the employer to "produc[e] evidence that the [plaintiff] was terminated for a legitimate nondiscriminatory reason."[58]  The burden then shifts back to the plaintiff to "produce evidence that the employer's motives were pretextual."[59]

---

[51] *Weber*, 913 P.2d at 96.

[52] *Goodman v. Wesley Med. Ctr., L.L.C.*, 78 P.3d 817, 821 (Kan. 2003).

[53] *Id.* (citing *Palmer v. Brown*, 752 P.2d 685, 689–90 (Kan. 1988)).

[54] *Id.*

[55] 411 U.S. 792, 824 (1973).

[56] *Foster v. Alliedsignal, Inc.*, 293 F.3d 1187, 1193 (10th Cir. 2002).

[57] *Goodman*, 78 P.3d at 821.

[58] *Id.*

[59] *Id.*

To establish a prima facie case of retaliatory discharge for whistleblowing, a plaintiff bears the "burden of proving by clear and convincing evidence" that: (1) "a reasonably prudent person would have concluded the [plaintiff's] co-worker or employer was engaged in activities in violation of rules, regulations, or the law pertaining to public health, safety, and the general welfare"; (2) the employer had knowledge of the plaintiff's good-faith reports of the violation; and (3) the employer terminated the plaintiff's employment in retaliation for reporting the violation.[60]

McConnell alleges that IMA terminated his employment in retaliation for repeatedly insisting that IMA prioritize its clients' best interests, instead of adhering to IMA's partnership panel, which paid IMA higher commission rates than other non-panel carriers. IMA argues McConnell's belief that IMA's stop-loss program was not in the best interest of IMA's clients, and his "fe[eling] that it was in IMA's clients' best interest to have more options, not fewer,"[61] does not satisfy the first element of his prima facie case. IMA also argues that McConnell cannot establish the second element of his prima facie case because he never reported any wrongdoing to higher authority. The Court agrees.

To support a claim for retaliatory discharge, McConnell must "clearly allege a violation of specific and definite rules, regulations, or laws beyond a mere feeling of wrongdoing."[62] McConnell argues that his complaints were based on well-established rules, regulations, and laws pertaining to the obligations owed by insurance brokers and producers to clients under

---

[60] *See id.* (quoting *Palmer v. Brown*, 752 P.2d 685, 690 (Kan. 1988)).

[61] Doc. 3 at 6.

[62] *Palmer v. Pentair*, No. 18-02638-CM-TJJ, 2019 WL 3239350, at *8 (D. Kan. July 18, 2019) (first citing *Goodman*, 78 P.3d at 822–23; and then citing *Diebold v. Sprint/United Mgmt. Co.*, No. 01-2504-KHV, 2002 WL 1071923, at *3 (D. Kan. Apr. 29, 2002), *aff'd*, 64 F. App'x 673 (10th Cir. 2003)).

Kansas law.  As support, he cites *Marshel Investments, Inc. v. Cohen*,[63] in which the Kansas Court of Appeals set forth the applicable standard of care for an insurance agent or broker who undertakes to procure insurance for another: "An insurance agent or broker who undertakes to procure insurance from another owes to the client the duty to exercise the skill, care and diligence that would be exercised by a reasonably prudent and competent insurance agent or broker acting under the same circumstances."[64]  The court referred to this standard of care as the "exercise care duty."[65]

McConnell also cites K.S.A. §§ 40-4909 and 40-2404.  In particular, McConnell points to K.S.A. § 40-4909(a)(8), which provides that the commissioner of insurance may "suspend, revoke or refuse renewal of any license" if the commissioner finds that the license holder "[u]sed any fraudulent, coercive, or dishonest practice, or demonstrated any incompetence, untrustworthiness or financial irresponsibility in the conduct of business."  McConnell notes generally that K.S.A. § 40-2404 outlines "unfair methods of competition and unfair or deceptive acts or practices in the business of insurance."[66]

In showing that he reported violations of specific and definite public policy rules, regulations, or laws, McConnell may not rely on the "exercise care duty" articulated in *Marshel* because it merely embodies a general standard of care for insurance agents and brokers.  To support a retaliatory discharge claim, the public policy must be "so thoroughly established as a state of public mind so united and so definite and fixed that its existence is not subject to any

---

[63] 634 P.2d 133 (Kan. Ct. App. 1981).

[64] *Id.* at 141.

[65] *Id.*

[66] K.S.A. § 40-2404.

substantial doubt."[67]  Public policy may not be determined on a subjective basis.[68]  The exercise

care duty provides no specific requirements, however, and whether an insurance agent or broker

has met this duty is a fact-intensive inquiry that "turns on the facts in each case."[69]  Because the

exercise care duty is not sufficiently specific or definite to constitute a "clear mandate of public

policy," it cannot serve as the foundation of McConnell's retaliatory discharge claim.[70]

Even assuming that K.S.A. §§ 40-4909 and 40-2404 provide specific and definite public

policy rules, regulations, or laws, the Verified Amended Complaint does not allege that any

specific conduct by IMA violated either statute.  The Verified Amended Complaint makes only

the conclusory allegation that "[a] reasonably prudent person would have concluded that IMA

was engaged in activities that violated rules, regulations, or the law pertaining to public health

and safety of the general welfare."[71]  But it does not allege how, when, or why a reasonably

prudent person would have reached this conclusion.  To the extent McConnell contends that he

relied on either statute when he allegedly "repeatedly complained that IMA's panel partner

program mandate *may result in* material facts being misrepresented or withheld from the

client,"[72] those complaints fall short of alleging that IMA had engaged in any wrongdoing at all.

Because McConnell has not demonstrated that he reported violations pursuant to K.S.A.

§§ 40-4909 or 40-2404, neither serve as the basis of his retaliatory discharge claim.[73]  Without

identifying a specific and definite public policy rule, regulation, or law that IMA allegedly

---

[67] *Goodman*, 78 P.3d at 823 (quoting *Palmer v. Brown*, 752 P.2d 685, 688 (Kan. 1988)).

[68] *Id.*

[69] *See id.*

[70] *See Goodman*, 78 P.3d at 823.

[71] Doc. 10 ¶ 125.

[72] *Id.* ¶ 124 (emphasis added).

[73] The Court declines to address at this time whether K.S.A. §§ 40-4909 and 40-2404 are sufficiently specific and definite to constitute a clear mandate of public policy.

violated through its stop-loss program, McConnell cannot satisfy the first element of his prima facie case.

Instead of reporting unlawful conduct by IMA, McConnell merely voiced his opinion about whether IMA's stop-loss program was in the "best interests" of IMA's clients.[74] McConnell thought that clients needed more options than IMA's panel partners could provide, and that IMA could "better serve" its clients by partnering with Stealth or a similar third party.[75] McConnell recognizes in his brief that "panel partners are not uncommon in the industry."[76]  As IMA points out, Alliant, McConnell's new employer, has a partnership panel of its own. McConnell told Gjellum and Winkler that "he had no objection to a panel," but "he felt that IMA could also utilize a partner like Stealth to help [IMA] keep the panelists honest and to make sure they were doing what was right for IMA's clients by looking at a broader market."[77]  McConnell offers nothing to show that his assessment of IMA's stop-loss program was based on anything more than his own opinion.  To allow a retaliatory discharge claim to be based on personal opinion "would effectively do away with the employment-at-will doctrine."[78]  McConnell's opinion about what was in the best interest of IMA clients is insufficient, standing alone, to support a retaliatory discharge claim.[79]

At most, McConnell expressed disagreement with his colleagues about IMA's stop-loss program.  He voiced his concerns to IMA's employee benefits group leaders, and they did not

---

[74] *See* Doc. 10 ¶¶ 64, 71, 76.

[75] *Id.* ¶ 61.

[76] Doc. 3 at 2.

[77] *Id.* at 6.

[78] *Id.*

[79] *See Goodman*, 78 P.3d at 822–23 ("It would be both troublesome and unsettling to the state of the law if we were to allow a retaliatory discharge claim to be based on a personal opinion of wrongdoing.").

agree with McConnell's assessment.  Gjellum explains that lower prices were only one factor to consider, and McConnell overlooked the value of the trust and negotiation power that IMA had with its panel partners if issues with a policy later arose.  "[S]uch simple disputes with a manager do not amount to whistleblowing."[80]

Discussions and disagreements in the workplace only give rise to whistleblower claims if "the plaintiff actually reports illegal conduct by the employer or one of the plaintiff's co-workers."[81]  Although the second element of a prima facie retaliatory discharge claim requires that the employer have knowledge of the plaintiff's reporting of unlawful conduct prior to termination, Kansas courts have interpreted this to mean that the employee must "seek to stop unlawful conduct through the intervention of a higher authority, either inside or outside the company."[82]  The plaintiff must report to a non-complicit higher authority because "not every workplace dispute over the water cooler on company practices equates to whistleblowing."[83]

The Court cannot conclude that McConnell ever reported any wrongdoing to anyone at IMA, let alone that he reported wrongdoing to "someone in authority above the wrongdoer."[84]  McConnell alleges that he complained about IMA's stop-loss program not only to those in charge of the program but also to IMA managers outside of the employee benefits chain-of-command.  He alleges that he "reported his concerns to Jeff Stemper" and "had numerous

---

[80] *DeHart v. Bd. of Cnty. Comm'rs of Riley Cnty.*, 463 F. Supp. 3d 1219, 1235 (D. Kan. 2020).

[81] *Conrad v. Bd. of Johnson Cnty. Comm'rs*, 237 F. Supp. 2d 1204, 1267 (D. Kan. 2002) (citations omitted); *see Fowler v. Criticare Home Health Servs., Inc.*, 10 P.3d 8, 14 (Kan. Ct. App. 2000) ("[The plaintiff's] disagreement with [the general manager] was just that; it did not qualify as an internal report to management of illegal coworker or company conduct."), *aff'd*, 26 P.3d 69 (Kan. 2001).

[82] *Shaw v. Sw. Kan. Groundwater Mgmt. Dist. Three*, 219 P.3d 857, 863 (Kan. Ct. App. 2009); *see also Palmer v. Brown*, 752 P.2d 685, 690 (Kan. 1988); *Fowler*, 10 P.3d at 15.

[83] *Fowler*, 10 P.3d at 15.

[84] *Lykins v. Certain Teed Corp.*, No. 11-2133, 2012 WL 5471254, at *7 (D. Kan. Nov. 9, 2012) (quoting *Goenner v. Farmland Indus.*, 175 F. Supp. 2d 1271, 1280 (D. Kan. 2001)), *aff'd*, 555 F. App'x 791 (10th Cir. 2014).

discussions with Patrick Lanning, . . . reporting his concerns about IMA's stop-loss program."[85] But McConnell does not indicate which "concerns" he reported to Stemper and Lanning.  To the extent he reported the same concerns that he had reported to IMA's employee benefits group leaders, the reports do not allege violations of specific and definite public policy rules, regulations, or laws.

Although McConnell provides no details about his reports to Stemper or Lanning, IMA has submitted an email thread between McConnell and Stemper in July 2020.  In his email to Stemper, McConnell wrote, "I don't for a minute believe that [Gjellum] or [Winkler] are not doing everything they can to do what's right for IMA, our clients and our associates."[86]  He explained, "I have simply brought up my thoughts regarding why I don't necessarily believe a limited panel of markets is the best way to manage stop loss for our clients, especially in a hard market," and "I am just asking and trying to make sure we are doing what is the best for our clients."[87]  McConnell's email does not bring to light any unlawful conduct; it merely expresses McConnell's opinion about how IMA could better manage stop loss for its clients.  Accordingly, McConnell has not demonstrated by clear and convincing evidence that he reported to higher authority any violations of public policy rules, regulations, or laws.

Because McConnell has not demonstrated that he can establish a prima facie case, he has not made a showing—much less a strong showing—that he is likely to succeed on the merits of his retaliatory discharge claim.

### B.    Irreparable Harm

---

[85] Doc. 10 ¶¶ 81–83.

[86] Doc. 8-6.

[87] *Id.*

Even if McConnell could establish a likelihood of success on the merits, the Court finds that he has not shown that he will face irreparable harm absent a temporary restraining order. Demonstrating irreparable harm is not "an easy burden to fulfill."[88]  "To constitute irreparable harm, an injury must be certain, great, actual 'and not theoretical.'"[89]  "Irreparable harm is not harm that is 'merely serious or substantial.'"[90]  The Tenth Circuit has held that a plaintiff establishes irreparable harm by showing "a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages."[91]  However, purely speculative harm does not amount to irreparable harm.[92]  And wholly conclusory statements, standing alone, will not suffice.[93]  A plaintiff must show that the injury alleged "is of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm."[94]  Thus, in determining whether a plaintiff has made the requisite showing, the Court must assess whether the harm is likely to occur before a ruling on the merits.[95]

McConnell asserts that he will continue to lose access to customers, employees, and information, which will, in turn, cause lost opportunities that are difficult, if not impossible, to repair or measure in money damages terms.  This will lead to further irreparable harm, McConnell contends, costing him income and harming his reputation and his ability to regain stature within the industry and remain current on industry developments.

---

[88] *Id.* (quoting *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003)).

[89] *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (quoting *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)).

[90] *Id.* (quoting *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001)).

[91] *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009) (quoting *Greater Yellowstone*, 321 F.3d at 1258).

[92] *Id.* (quoting *Greater Yellowstone*, 321 F.3d at 1260).

[93] *Dominion Video Satellite v. Echostar Satellite Corp.*, 356 F.3d 1256, 1261 (10th Cir. 2004).

[94] *Heideman*, 348 F.3d at 1189.

[95] *RoDa Drilling Co.*, 552 F.3d at 1210 (quoting *Greater Yellowstone*, 321 F.3d at 1260).

The Court is not convinced that McConnell will suffer irreparable harm if the temporary restraining order does not issue.  McConnell has not shown that he is losing access to customers, employees, information, or employment opportunities because of the non-solicitation clause or anti-raiding clause contained in the Agreement.  In fact, McConnell's briefs offer no factual discussion of the harm he will suffer if the temporary restraining order does not issue.  His conclusory statements, without more, are insufficient to establish irreparable harm.[96]

Moreover, as IMA points out, McConnell is now employed by Alliant, one of IMA's primary competitors, in largely the same role he filled for IMA and in the same geographical market.  McConnell concedes that the Agreement permits him to work for a competitor and build a book of business outside of IMA clients covered under paragraph 9 of the Agreement.  Accordingly, the Court concludes that McConnell has not met his burden of establishing that he will suffer irreparable harm absent a temporary restraining order.

### C.     Balance of Harms and Public Interest

As the foregoing discussion illustrates, the harm McConnell will face in the absence of a temporary restraining order would not be great.  The restrictive covenants contained in paragraph 9 of the Agreement are temporary and limited in scope, and McConnell has already secured employment with a large insurance brokerage firm as a senior vice president in Kansas City.

---

[96] McConnell cites two cases from other jurisdictions that he contends support his claim of irreparable harm: *Brenneman v. NVR, Inc.*, No. 107CV065, 2007 WL 490166 (S.D. Ohio Feb. 9, 2007), and *MacGinnitie v. Hobbs Group, LLC*, 420 F.3d 1234 (10th Cir. 2005).  McConnell's reliance on these cases is misplaced.  Both involved restrictive covenants that were overbroad, and thus unenforceable, under the applicable state law.  *See MacGinnitie*, 420 F.3d at 1242 ("[The plaintiff] has shown irreparable harm which cannot be undone through monetary remedies, in the form of *unenforceable* restrictions on his access to customers, employees, and information." (emphasis added)); *Brenneman*, 2007 WL 490166, at *5.  As described in detail above, McConnell has not established that the restrictive covenants in paragraph 9 of the Agreement are likely unenforceable under Kansas law.  Moreover, the plaintiff in *Brenneman* risked being "forced out of [his] industry [al]together" if the defendant was not enjoined from "threatening or attempting to enforce the ambiguous and overbroad" restrictive covenants at issue.  *Brenneman*, 2007 WL 490166, at *5.  McConnell, now employed by Alliant, faces no similar risk.

The Court finds that, on balance, the harm to IMA caused by a temporary restraining order preventing it from enforcing the restrictive covenants, including a threatened loss of customers and employees, outweighs any harm to McConnell caused by abiding by those restrictive covenants.

Further, the Court cannot find that that the temporary restraining order would serve the public interest.  "The enforcement of valid contracts is in the public interest.  Moreover, the public has an interest in restraining unfair competitive practices."[97]  Thus, the public interest would not be served by restraining IMA from enforcing the restrictive covenants contained in paragraph 9 of the Agreement.

For these reasons, McConnell's motion for temporary restraining order is denied.

**IT IS THEREFORE ORDERED BY THE COURT** that Plaintiff Tracy McConnell's Motion for Temporary Restraining Order (Doc. 2) is **DENIED**.

**IT IS SO ORDERED.**

Dated: March 9, 2021

> S/ Julie A. Robinson
> JULIE A. ROBINSON
> CHIEF UNITED STATES DISTRICT JUDGE

---

[97] *Heatron, Inc. v. Shackelford*, 898 F. Supp. 1491, 1502 (D. Kan. 1995) (citations omitted).